#23566-a-JKM

**2006 SD 11**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,　　　　　Plaintiff and Appellee,

　　　v.

GARY DEAN WILLIAMS,　　　　　Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

HONORABLE PETER H. LIEBERMAN
Judge

* * * *

LAWRENCE E. LONG
Attorney General

CRAIG M. EICHSTADT
Deputy Attorney General　　　　Attorneys for plaintiff
Pierre, South Dakota　　　　and appellee.

JOHN HINRICHS
Office of the Minnehaha
　County Public Defender　　　　Attorney for defendant
Sioux Falls, South Dakota　　　　and appellant.

* * * *

CONSIDERED ON BRIEFS
ON JANUARY 9, 2006

OPINION FILED **02/01/06**

#23566

MEIERHENRY, Justice.

[¶1.] Defendant Gary Dean Williams (Williams) appeals from his conviction for three counts of grand theft by deception. Williams asserts that evidence was improperly admitted at his trial. He also asserts that his thirty-year sentence, with nine years suspended, constitutes cruel and unusual punishment. We affirm.

## FACTS

[¶2.] The three counts of which Williams was convicted involved three different victims: Michael Crago (Crago), Michael and Cheryl Brimmer (the Brimmers), and Gerald Heck (Heck). Crago and Williams, both hearing impaired, first became acquainted while attending the South Dakota School for the Deaf. In early 2002, the two met by chance at a gas station. Prior to their encounter at the gas station, the two had not seen each other for a long time. Williams, who worked as a carpenter, convinced Crago to pay him $2,050 to repair Crago's roof. Williams also told Crago that he had $150,000 in the bank and wanted to invest in real estate. Crago agreed to join Williams in the real estate venture, and thereafter wrote Williams a series of personal checks over a period of time. Williams represented to Crago that he used the money to invest in twelve separate properties. By June 2002, Crago had paid Williams close to $75,000. Although Crago asked Williams for proof of the transactions, Williams cleverly kept stalling with promises of providing it later, all the while taking advantage of Crago's trust and friendship. Crago eventually ran out of cash and began providing additional funds to Williams by borrowing from his credit card. Williams' scheme consisted of a litany of excuses and lies.

-1-

[¶3.] In May 2002, Crago introduced Williams to the Brimmers, who were also members of the deaf community. Williams represented himself as a licensed real estate agent who could sell the Brimmers' home. He never produced his license as the Brimmers requested. Nevertheless, the Brimmers agreed to Williams' services. At Williams' request, they also wrote him several personal checks that Williams said he would invest at Great Western Bank. Williams never provided proof to the Brimmers of what he did with the money. Again, his alleged business relationship with the Brimmers was fraught with misrepresentations and conversion of funds for his personal use.

[¶4.] During the same time, Williams met Heck, who was not a member of the deaf community. Heck told Williams that he was an independent investor. Williams lied to Heck by claiming to have purchased the Brimmers' home, and he asked Heck to invest $5,000 in the improvement of the home so that Williams could sell it for a profit. Heck agreed and paid Williams accordingly. Heck drafted a contract to reflect the transaction. Upon the sale of the Brimmers' home, Williams claimed that Brimmers took all the proceeds with no valid explanation of why Heck was not reimbursed. Subsequently, Heck also gave Williams additional money, none of which was returned.

[¶5.] Williams eventually reimbursed Crago for approximately $10,000. Crago, however, never received proof of any other interest in the items in which Williams claimed to have invested. Further, the Brimmers never received statements for their investments at Great Western Bank, and Williams never reimbursed them for the money. The Brimmers' home eventually was sold, but

upon sale they discovered that items such as appliances had been removed from the home without the Brimmers' knowledge. Because Williams never owned the Brimmers' home, Heck received no reimbursement from Williams upon the sale of the house.

[¶6.] In early 2004, Williams was indicted on three counts of Grand Theft by Deception, a crime punishable by up to ten years in the penitentiary and/or a $10,000 fine. The indictment alleged that Williams intended to deprive each of his victims—Crago, the Brimmers, and Heck—of property exceeding $500 in value by creating the false impression that he was using their property for investments. Subsequent to the indictment, the State and Williams reached a plea agreement that required Williams to plead guilty to one count of the indictment. In exchange, the State agreed to dismiss the other two counts and recommend a suspended execution of a penitentiary sentence with six months in the county jail and restitution of $169,948 for all three counts. The plea agreement was rejected twice by the circuit court. It later indicated it would accept the plea agreement only if Williams pleaded guilty to two counts of the indictment so that a fifteen-year suspended sentence could be imposed. Williams chose not to plead guilty to two of the counts and withdrew his guilty plea. Subsequently, a jury found Williams guilty of all three counts of grand theft by deception. Judge Lieberman ultimately sentenced Williams to 30 years in the penitentiary, with nine years suspended. Williams appeals and raises the following issues:

## ISSUES

1. Whether the trial court erred by admitting testimony concerning the contents of public records.

2. Whether Williams' sentence is cruel and unusual in violation of the Eighth Amendment to the United States Constitution.

## DECISION

*Admissibility of Testimony Concerning the Contents of Public Records.*

[¶7.]      At trial, Gayland Schmidt, a detective with the Sioux Falls Police Department, testified about his investigation of the allegations against Williams. Specifically, Schmidt testified that he received a list of the properties in which Williams allegedly invested. The jury then heard the following exchange between the prosecutor and Schmidt:

> Q: With that information did you make any attempt to discover if there was any corroboration for representations made to [Crago] that those properties had been purchased by Mr. Williams and [Crago]?
>
> A: Yes, I did.
>
> Q: And how did you go about seeing if there was any corroboration to the fact?
>
> A: I went to the Minnehaha County Register of Deeds Office, which is public records and they allowed me to look up on their computer base the ownership of those properties.
>
> Q: Did you know how to use that system when you got there?
>
> A: They taught me how to use that.
>
> Q: Was it complicated?
>
> A: No.
>
> Q: Did you then go through each of those properties individually to determine if there was any corroboration for [Crago]'s belief that they had been transferred to Mr. Williams and himself?
>
> A: I looked up each property.

> Q: And did you find any corroboration of any of those properties being transferred to Mr. Williams or [the victim]?
>
> . . .
>
> A: No, I could not.

Williams objected to the admission of this testimony, but his objection was overruled. He now appeals that evidentiary ruling. Williams argues that Schmidt's testimony regarding the contents of the deed records constituted inadmissible hearsay. Williams admits that the contents of public records are admissible under the public records exception to the hearsay exclusion rule, SDCL 19-16-12 (Rule 803(8)), which allows the admission of public records kept by public offices or agencies under a duty to report. Williams argues, however, that the best evidence rule, SDCL 19-18-2 (Rule 1002), requires the production of certified copies of those records. Williams claims that without that evidence the State failed to establish that he defrauded Crago.

[¶8.] We review a trial court's ruling on the admissibility of evidence under an abuse of discretion standard. State v. Mattson, 2005 SD 71, ¶13, 698 NW2d 538, 544. Even if error is found, however, "it must be prejudicial in nature before this Court will overturn the trial court's evidentiary ruling." *Id.* (citation omitted). Under the rules of evidence, hearsay is an out-of-court assertion, either oral or written, which is "offered in evidence to prove the truth of the matter asserted." SDCL 19-16-1 (Rule 801(a) to (c)). Hearsay is generally inadmissible. SDCL 19-16-4 (Rule 802).

[¶9.]     In this case, the evidence concerning the public records was offered to show that Williams never owned the properties he purported to own when soliciting investments from the victims. While not specifically cited by the trial court, Rule 803(10) explicitly allows the type of testimony at issue here. That rule, known as the negative records rule, provides:

> To prove the absence of a record . . . or the nonoccurrence or nonexistence of a matter of which a record . . . was regularly made and preserved by a public office or agency, evidence in the form of . . . *testimony*, that diligent search failed to disclose the record . . . is not excluded by [SDCL] 19-16-4, even though the declarant is available as a witness.

SDCL 19-16-14 (Rule 803(10)) (emphasis added). Under the federal counterpart to Rule 803(10), the Eighth Circuit Court of Appeals has admitted similar evidence in a criminal case. United States v. Hale, 978 F2d 1016, 1020-21 (8thCir 1992). The defendant in *Hale* was charged with possession of unregistered firearms. *Id.* at 1017. To prove the lack of registration, the government introduced two affidavits by specialists from the Bureau of Alcohol, Tobacco and Firearms, which stated that after a diligent search of firearms registration records, no record was located that showed any application by the defendant to register his weapons. *Id.* at 1020. On appeal, the Eighth Circuit held that the evidence was admissible hearsay under the federal "negative records" rule[1] and that such evidence did not violate the constitutional right to confrontation. *Id.* at 1021.

---

1.     As noted in *Hale*, Federal Rule of Evidence 803(10) provides an exception to the hearsay rule "'[t]o prove the absence of a record . . . or the nonoccurrence or nonexistence of a matter of which a record . . . was regularly made and preserved by a public office or agency, evidence in the form of . . . testimony,
(continued . . .)

[¶10.] Here, confrontation was not an issue because Schmidt testified at trial and was subject to cross-examination. Consequently, Rule 803(10) renders Schmidt's testimony admissible hearsay. Pursuant to the rule, the State was able to offer proof through Schmidt's testimony that Williams had no ownership in the investment properties as he had claimed, that is, proof of the absence of a record of ownership. Even though SDCL 19-16-14 (Rule 803(10)) was not specifically cited, the trial court correctly concluded that the testimony was not inadmissible hearsay.

[¶11.] Williams' objection based on the best evidence rule, SDCL 19-18-2 (Rule 1002), also fails because the testimony was not offered to prove the contents of a record. As we have stated, the best evidence rule applies "only when one seeks to prove the contents of documents or recordings. [It] is inapplicable when content is not at issue." State v. Downing, 2002 SD 148, ¶12, 654 NW2d 793, 797 (citations and quotation marks omitted). Therefore, the trial court did not abuse its discretion in allowing Schmidt's testimony.

*Validity of Williams' Sentence under the Eighth Amendment of the United States Constitution.*

[¶12.] Williams alleges that his sentence is grossly disproportionate to the conduct for which he was convicted and therefore constitutes cruel and unusual punishment under the Eighth Amendment to the United States Constitution. The Eighth Amendment of the United States Constitution, applicable to the states through the Fourteenth Amendment, prohibits the infliction of "cruel and unusual

---

(. . . continued)
    that diligent search failed to disclose the record.'" 978 F2d at 1020-21 (quoting FedREvid 803(10)).

punishments." US Const amend VIII. When assessing a proportionality challenge, we must first determine whether the sentence appears grossly disproportionate. State v. Guthmiller, 2003 SD 83, ¶43, 667 NW2d 295, 309. Our standard of review for such challenges is well established:

> "[To] assess a challenge to proportionality we first determine whether the sentence appears grossly disproportionate. To accomplish this, we consider the conduct involved, and any relevant past conduct, with utmost deference to the Legislature and the sentencing court." [State v. Pugh, 2002 SD 16, ¶19, 640 NW2d 79, 85] (citing State v. Bonner, 1998 SD 30, ¶17, 577 NW2d 575, 580). If the sentence does not appear grossly disproportionate, no further review is necessary. State v. Hinger, 1999 SD 91, ¶16, 600 NW2d 542, 547. If the sentence does appear grossly disproportionate, an intra- and inter-jurisdictional analysis shall be conducted. *Id.* We also consider "the gravity of the offense and the harshness of the penalty;" Solem v. Helm, 463 US 277, 292 103 SCt 3001, 3011, 77 LEd2d 637 (1983); and other relevant factors, such as the effect this type of offense has on society. *Hinger,* 1999 SD 91, ¶16, 600 NW2d at 547.

*Id.*[2]

---

2.  Several of our decisions suggest that sentence challenges are reviewed under the abuse of discretion standard. *See, e.g.*, State v. McKinney, 2005 SD 73, ¶10, 699 NW2d 471, 476 (*McKinney I*) ("We ultimately review a sentence within statutory limits under an abuse of discretion standard."); State v. Goodroad, 1997 SD 46, ¶40, 563 NW2d 126, 135 ("A sentence within the statutory limits is reviewed under an abuse of discretion standard."); State v. Anderson, 1996 SD 46, ¶30, 546 NW2d 395, 402 ("'Where the court is asked to review a punishment within the statutory limits, the question is whether the trial court abused its discretion'"); State v. Kaiser, 526 NW2d 722, 726 (SD 1995) (same); State v. Reed, 451 NW2d 409, 411 (SD 1990) (same). That standard of review apparently originated in *State v. Phipps*, which states that "[w]here a court is asked to review a punishment within [statutory] limits, the question in reality is whether the trial judge abused his discretion." 318 NW2d 128, 132 (SD 1982).

    The cases that *Phipps* cites for that standard of review all address Eighth Amendment challenges; they do not, however, explicitly use the abuse of discretion standard of review. *See* State v. Antelope, 304 NW2d 115 (SD

(continued . . .)

#23566

[¶13.]     Applying this standard, we must first consider Williams' conduct. Williams was convicted on three counts of grand theft by deception, each of which is a Class 4 felony punishable by up to ten years in the state penitentiary and a $10,000 fine. Two of Williams' charges were based on his victimization of fellow members of the deaf community. Williams, in part, used their common disability to gain their confidence and trust and to entice them into giving him their cash and property. He continually denied the requests of all the victims for accountings, and he assured them that proof of their investments would be forthcoming. Even on the

_____

(. . . continued)

1981); State v. Curtis, 298 NW2d 807 (SD 1980); State v. Helm, 287 NW2d 497 (SD 1980). *Phipps* and the cases it cites all review the sentences under the "shock the conscience" test. *Phipps*, 318 NW2d at 132-133; *Antelope*, 304 NW2d at 117; *Curtis*, 298 NW2d at 811; *Helm*, 287 NW2d at 498-99. Under that test, "a sentence within the statutory limits is not reviewable on appeal, even if it is regarded as excessive," but the sentence "may be constitutionally offensive if its duration is so excessive as to 'shock the conscience.'" *Helm*, 287 NW2d at 498 (citations omitted). That test, however, is no longer applicable to Eighth Amendment challenges. State v. Bonner, 1998 SD 30, ¶13, 577 NW2d 575, 579. Our recent cases indicate that we regularly consider the constitutionality of sentences even though they are within statutory limits. *See, e.g.*, State v. McKinney, 2005 SD 74, ¶28, 699 NW2d 460, 468 (*McKinney II*); State v. Pasek, 2004 SD 132, ¶35, 691 NW2d 301, 312; State v. Smiley, 2004 SD 119, ¶4, 689 NW2d 427, 429.

We note this changing analysis to Eighth Amendment proportionality challenges in order to confirm the proper standard of review. As we recently explained, "[i]nitially we review the sentencing court's decision under the abuse of discretion standard," but "for assertions of constitutional error the standard of review under both our federal and state constitutions is the gross disproportionality test." *McKinney II*, 2005 SD 74, ¶26, 699 NW2d at 468 (citations and quotation marks omitted). Thus, the abuse of discretion standard does not apply to Eighth Amendment challenges; rather, the standard set forth in *Bonner*, and repeated in *Guthmiller*, guides our review. *Cf.* State v. Krahwinkel, 2002 SD 160, ¶13, 656 NW2d 451, 458 ("when an asserted error implicates an infringement of a constitutional right, we employ a de novo standard of review").

-9-

day of his sentencing, Williams failed to account for the victims' property. As a result, Crago lost approximately $69,000, the Brimmers lost approximately $107,000, and Heck lost approximately $14,000.

[¶14.]    Although Williams had no similar prior offenses, his conduct here involved three offenses and three victims and was part of a pattern of deception. There was no evidence that Williams ever intended to invest the property or repay the victims. Further, Williams never disclosed what he did with the property, nor did he accept responsibility for his conduct.

[¶15.]    The trial court imposed consecutive sentences of ten years with three years suspended for each of the three felony convictions. Additionally, the court required Williams to pay restitution as part of the conditions of parole. The sentence is within the maximum sentence of ten years in the state penitentiary set by the Legislature. Additionally, depending upon his behavior in prison and on parole, he could actually serve less than the ten years because the trial court suspended three years on each sentence. Thus, based upon our standard of review, the nature of the conduct involved in the crimes, and the appropriate deference given the Legislature and the sentencing court, we cannot say that the sentence appears grossly disproportionate. *C.f.*, State v. Pasek, 2004 SD 132, ¶37, 691 NW2d 301, 313 (affirming a life sentence for first-degree robbery under the habitual offender enhancement); State v. Bonner, 1998 SD 30, ¶23, 577 NW2d 575, 581-82 (finding that a maximum sentence of fifteen years for the second degree burglary conviction of a developmentally disabled defendant was disproportionate where his accomplices received probation); State v. O'Connor, 408 NW2d 754, 756 (SD 1987)

(finding proportional three concurrent fifty-year sentences and a fine of $25,000 for convictions for conspiracy to commit grand theft, conspiracy to commit third degree burglary, and grand theft where the offenses involved approximately $250,000). Since the first prong of the proportionality review has not been met, we need not proceed any further in our analysis.

[¶16.] Affirmed.

[¶17.] GILBERTSON, Chief Justice, and SABERS, KONENKAMP, and ZINTER, Justices, concur.