UNITED STATES of America, Plaintiff,

v.

**Alejandro Diego ORNELAS, Defendant.**

No. 93–CR–317.

United States District Court,
D. Colorado.

Jan. 12, 1994.

Thomas O'Rourke, Asst. U.S. Atty., Denver, CO, for plaintiff.

Raymond Moore, Asst. Federal Public Defender, Denver, CO, for defendant.

## ORDER DENYING MOTION TO DISMISS INDICTMENT

CARRIGAN, District Judge.

On October 7, 1993, a federal grand jury returned an indictment charging that eighteen year old Alejandro Diego Ornelas had violated 18 U.S.C. § 922(q)(1)(A). The indictment alleged that on August 31, 1993, Mr. Ornelas knowingly had possessed, in and near the grounds of West High School in Denver, Colorado, a Bryco-model 48 .380–caliber pistol that had been transported in interstate commerce. Mr. Ornelas has moved to dismiss the indictment. The government has responded by opposing that motion. The issues have been briefed, and oral argument has been heard.

Section 922(q)(1)(A), enacted as part of the Comprehensive Crime Control Act of 1990,[1] provides in pertinent part:

> "It shall be unlawful for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe is a school zone."

A "school zone" is defined by the statute as a place:

> "(A) in, or on the grounds of, a public, parochial or private school; or
>
> (B) within a distance of 1000 feet from the grounds of a public, parochial or private school." 18 U.S.C. § 921(a)(25).[2]

---

1. The Comprehensive Crime Control Act of 1990, Pub.L. No. 101–647, 104 Stat. 4789, 4789–4968 (1990), amended the original § 922. The original § 922 was enacted as part of the Omnibus Crime Control and Safe Streets Act of 1968. Pub.L. No. 90–351, § 902, 82 Stat. 197, 226–35 (1968). Later that year, before the Omnibus Crime Control Act became effective, Congress reenacted § 922 as part of the Gun Control Act of 1968, the stated purpose of which was "to provide for better control of the interstate traffic in firearms." Pub.L. No. 90–618, §§ 101–02, 82 Stat. 1213, 1213–14 (1968).

The original § 922 also was amended in 1986 by the Firearm Owner's Protection Act, Pub.L. No. 99–308, 100 Stat. 449 (1986), which added subsection 922(*o*), discussed *infra*.

2. The statute provides exceptions not applicable here. It further provides punishment by imprisonment up to five years, a fine up to $5000, or both, plus a supervised release term up to one

In defining the crime, Congress did not expressly provide as an element any nexus with interstate commerce. That is, Congress omitted the language usually found in such statutes to invoke federal jurisdiction under the Commerce Clause: a requirement that the gun involved had travelled in interstate commerce. Nor is it apparent that Congress intended to rest federal jurisdiction on the spending power, as in statutes regulating schools that receive federal funds, or on federally protected civil rights, frequently invoked to justify federal regulation of local schools. Thus the courts are left to guess at the federal jurisdictional ground intended by Congress, if Congress considered the matter at all. The government suggests the Commerce Clause must have been the intended nexus, and, in an effort to cover the statute's facial omission, has alleged in the indictment that the gun had travelled in interstate commerce.

 Mr. Ornelas has filed a motion to dismiss the indictment, claiming that § 922(q) violates the Tenth Amendment to the United States Constitution,[3] and that Congress exceeded its authority under the Commerce Clause by enacting it.[4] Mr. Ornelas' motion relies upon *United States v. Lopez*, 2 F.3d 1342 (5th Cir.1993), which reversed a § 922(q) conviction because "Congress has not done what is necessary to locate section 922(q) within the Commerce Clause." *Id.* at 1368.

## I. *ANALYSIS.*

 Some courts, including our highest Court, have held that under Congress's extensive commerce power, it may regulate a class of activities that affects interstate commerce without proof or special findings that any particular intrastate activity within that

class had an effect on interstate commerce. Thus, in reviewing the validity of a statute under the Commerce Clause, a court must determine whether Congress reasonably could have found a nexus between the class of regulated activity and interstate commerce. *Perez v. United States*, 402 U.S. 146, 152–56, 91 S.Ct. 1357, 1360–61, 28 L.Ed.2d 686 (1971); *United States v. Evans*, 928 F.2d 858, 862 (9th Cir.1991); *United States v. Holland*, 841 F.Supp. 143 (E.D.Pa.1993).

### A. *Congress's Powers Under the Commerce Clause Are Extensive.*

The United States Supreme Court recognized the broad scope of congressional authority under the Commerce Clause as far back as 1824. *See Gibbons v. Ogden*, 22 U.S. (9 Wheat) 1, 6 L.Ed. 23 (1824). Since that time,

"[t]he volume of interstate commerce and the range of commonly accepted objects of government regulation have ... expanded considerably ... and the regulatory authority of Congress has expanded along with them. As interstate commerce has become ubiquitous, activities once considered purely local have come to have effects on the national economy, and have accordingly come within the scope of Congress' commerce power." *New York v. United States*, —— U.S. ——, ——–——, 112 S.Ct. 2408, 2418–19, 120 L.Ed.2d 120 (1992).

Indeed, only twice in the past fifty-six years has the Supreme Court held legislation to be beyond the scope of Congress's commerce power, and one of those decisions was overruled nine years later. *See id.; National*

---

year, yet the crime is denominated a misdemeanor rather than a felomeanor.

**3.** The Tenth Amendment provides:

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

If a power is delegated to Congress by the Constitution, it cannot be reserved to the states by the Tenth Amendment. *New York v. United*

States, —— U.S. ——, ——, 112 S.Ct. 2408, 2417, 120 L.Ed.2d 120 (1992). Thus, if enacting § 922(q) was a lawful exercise of Congress's legislative power under the Commerce Clause, the Tenth Amendment is not violated.

**4.** The Commerce Clause provides in pertinent part:

"The Congress shall have power ... to regulate commerce ... · among the several States...." U.S. Const. art. I, § 8, cl. 3.

*League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), *overruled by Garcia v. San Antonio Metro. Transit. Auth.,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). In overruling *National League of Cities,* the *Garcia* Court stated, "State sovereign interests ... are more properly protected by procedural safeguards inherent in the structure of the federal system than by judicially created limitations on federal power." 469 U.S. at 552, 105 S.Ct. at 1018.

### B. *Congress May Regulate Intrastate Activities That Affect Interstate Commerce and Need Not Explicitly Require Proof of a Commerce Nexus in Each Statute.*

█ Mr. Ornelas emphasizes that, unlike various other federal criminal statutes enacted under the authority of the Commerce Clause, § 922(q) does not require the government to prove a nexus to interstate commerce as an element of the offense. In plain language, he points out that the statute he attacks does not require proof that the gun possessed had travelled across a state line, as is required by nearly all other federal firearms statutes. However, under its extensive commerce power, Congress may regulate purely intrastate activities that *affect* interstate commerce,[5] and it need not require proof of a nexus between the activity and interstate commerce. *See, e.g., Perez v. United States,* 402 U.S. 146, 153, 91 S.Ct. 1357, 1361, 28 L.Ed.2d 686 (1971) (upholding 18 U.S.C. §§ 891–894, which prohibit extortionate credit transactions but do not expressly require proof of an interstate commerce nexus); *United States v. Hale,* 978 F.2d 1016, 1018 (8th Cir.1992) and *United States v. Evans,* 928 F.2d 858, 862 (9th Cir. 1991) (upholding 18 U.S.C. § 922(*o* ) and 26 U.S.C. § 5861, which prohibit, *inter alia,*

possession of machine guns and unregistered firearms but do not expressly require proof of an interstate commerce nexus); *United States v. Lane,* 883 F.2d 1484, 1492 (10th Cir.1989) (upholding 18 U.S.C. § 245(b)(2)(C), which prohibits interference with applications for or enjoyment of private employment because of race, color, religion, or national origin but does not expressly require proof of an interstate commerce nexus).

### C. *Congress Need Not Make Particularized Findings in Order to Legislate.*

█ Not only may Congress regulate purely intrastate activities without requiring proof of a nexus to interstate commerce, the Supreme Court has indicated that Congress need not make particularized findings in order to legislate in this area. *Perez,* 402 U.S. at 156, 91 S.Ct. at 1362.[6] Under *Perez,* Congress properly may regulate a class of activities that affects interstate commerce without proof that the particular intrastate activity regulated had an effect on commerce. *Id.* at 152, 91 S.Ct. at 1360; *see also id.* at 154, 91 S.Ct. at 1361 ("Where the class of activities is regulated and that class is within the reach of the federal power, the courts have no power 'to excise, as trivial, individual instances' of the class." (quoting *Maryland v. Wirtz,* 392 U.S. 183, 193, 88 S.Ct. 2017, 2022, 20 L.Ed.2d 1020 (1968))); *United States v. Smaldone,* 485 F.2d 1333 (10th Cir.1973), *cert. denied,* 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286 (1974) ("[A]ctivities within a regulated class of activities which do not exceed the reach of the federal power under the Commerce Clause need not be shown, in each individual case, to affect interstate commerce."). The only function of the courts,

---

**5.** "Even activity that is purely intrastate in character may be regulated by Congress, where the activity ... affects commerce among the States or with foreign nations." *Fry v. United States,* 421 U.S. 542, 547, 95 S.Ct. 1792, 1795, 44 L.Ed.2d 363 (1975).

**6.** The *Lopez* court noted, but discarded, the United States Supreme Court's language in *Perez,* saying, "No citation is given, nor is the meaning of [that] sentence entirely clear." *Lopez,* 2 F.3d

at 1362 n. 41. The *Lopez* court rested its decision largely on the ground that Congress had failed to make particularized findings that possession of firearms substantially affects interstate commerce. *See Lopez,* 2 F.3d at 1364 ("[I]n such a situation there is nothing to indicate that Congress itself consciously fixed, as opposed to simply disregarded, the boundary line between the commerce power and the reserved power of the states.").

therefore, is to determine whether the activity regulated is within the reach of the federal power. *United States v. Darby*, 312 U.S. 100, 120–21, 61 S.Ct. 451, 460, 85 L.Ed. 609 (1941).

■ In making that determination, courts appropriately may consider the history of other, earlier legislation regulating the same class of activities.[7] The Tenth Circuit followed this approach in *United States v. Lane*, 883 F.2d 1484 (10th Cir.1989). Defendants in *Lane* challenged 18 U.S.C. § 245(b)(2)(C), which criminalized interference with applications for or enjoyment of private employment because of race, color, religion, or national origin. They argued that the statute had not been validly enacted pursuant to Congress's commerce power because there were no legislative findings regarding the effect of racial discrimination on interstate commerce. *Id.* at 1487, 1492.

The court, however, quoted *Perez* and declared: "Congress is not required to make 'particularized findings in order to legislate.'" *Id.* at 1492. The court noted that, although Congress had made no interstate commerce findings in 1988, when it enacted 18 U.S.C. § 245, it had "heard extensive evidence on the burdens that racial discrimination places on interstate commerce in connection with its enactment of the Civil Rights Act of 1964." *Id.* The court concluded that there was no reason Congress could not have relied upon that earlier evidence to support § 245 as well. *Id.*

Similarly, the Eighth Circuit in *Hale*, 978 F.2d 1016, 1018 (8th Cir.1992), considered the legislative history of the original § 922, promulgated as part of the Omnibus Crime Control and Safe Streets Act of 1968. The court noted that, although Congress had made no interstate commerce findings in 1986 when it enacted 18 U.S.C. § 922(*o*) regulating the possession of machine guns,

> "[w]hen it first enacted section 922, Congress found facts indicating a nexus between the regulation of firearms and the commerce power. The 1986 amendments to section 922 added sub-section (*o*) without substantially altering the findings of fact on this point." *Id.*

This, the court concluded, was sufficient evidence that § 922(*o*) had been validly enacted pursuant to Congress's commerce power. *Id.*[8]

## D. Section 922(q) Was Validly Enacted Pursuant to Congress's Commerce Power.

■ The Eighth Circuit's analysis in *Hale* with respect to § 922(*o*) is equally applicable to § 922(q). Both statutes regulate the possession of firearms. Both amended the original § 922. Neither expressly requires proof of an interstate commerce connection. And neither was accompanied by legislative findings regarding interstate commerce. *Compare* Pub.L. No. 99–308, 100 Stat. 449 (1986) (§ 922(*o*)) *with* Pub.L. 101–647, 104 Stat. 4789, 4789–4968 (1990) (§ 922(q)).

Moreover, like the 1986 amendments to § 922, the Comprehensive Crime Control Act of 1990 did not "substantially alter[ ] the findings of fact" that supported Congress's enactment of the Omnibus Crime Control and Safe Streets Act of 1968. *Hale*, 978 F.2d at 1018.[9] Congress made several specific findings relating to interstate commerce in

---

7. In *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), the Supreme Court considered the "minority business enterprise" (MBE) provision of the Public Works Employment Act of 1977. To determine whether the provision's objectives were within Congress's power, the Court examined the "background of ongoing efforts directed toward deliverance of the century-old promise of equality of economic opportunity," *id.* at 463, 100 S.Ct. at 2767, and concluded that, "[a]gainst this backdrop of legislative and administrative programs, it is inconceivable that Members of both Houses were not fully aware of the objectives of the MBE provi-

sion and of the reasons prompting its enactment." *Id.* at 467, 100 S.Ct. at 2769.

8. *See also Evans*, 928 F.2d at 862 (upholding § 922(*o*) upon finding that it was reasonable for Congress to conclude that possession of firearms affects the national economy, "if only through the insurance industry.").

9. Indeed, a House Report outlining the purposes of the Comprehensive Crime Control Act of 1990 "echo[es] the concerns articulated in 1968." *Holland*, 841 F.Supp. at 143, 144; *see* H.R.Rep. No. 681(I), 101st Cong., 2d Sess. (1990), *reprinted in* 1990 U.S.C.C.A.N. 6472, 6473.

1968 when it enacted the Omnibus Act: for instance it found widespread traffic in firearms moving in or otherwise affecting interstate commerce, Pub.L. No. 90–351, § 901(a)(1), 82 Stat. 197, 225 (1968), and a causal relationship between the easy availability of firearms and juvenile crime. *Id.* at 225–26. As Justice Powell observed in *Fullilove,* there is no reason why Congress, when enacting legislation, cannot rely on:

> "the information and expertise [it] acquires in the consideration and enactment of earlier legislation. After Congress has legislated repeatedly in an area of national concern, its members gain experience that may reduce the need for fresh hearings or prolonged debate when Congress again considers action in that area." 448 U.S. at 503, 100 S.Ct. at 2787 (Powell, J., concurring).

Finally, although the *Lopez* court states that a House Judiciary Subcommittee hearing on the proposed § 922(q) mentioned no evidence indicating that possessing guns in and near schools affects interstate commerce, 2 F.3d at 1366, the record reflects that the police chief of Cleveland, Ohio, testified as follows:

> "We have identified gang members coming from Los Angeles, Chicago, Detroit, and other areas of the country, coming into the Cleveland area and trying to organize our gangs.... We have reason to believe that they are also supplying them with weapons." *The Gun–Free School Zones Act of 1990: Hearing Before the Subcomm. on Crime and the Comm. on the Judiciary,* 101st Cong., 1st Sess. (1990) (statement of Edward Kovacic).

The chief stated that these gang members undoubtedly were bringing weapons into Ohio from other states and suggested that the federal government could help solve the problem. *Id.* This testimony alone supports the conclusion that Congress reasonably could have found a nexus between § 922(q) and interstate commerce. *Cf. Wickard v. Filburn,* 317 U.S. 111, 128–29, 63 S.Ct. 82, 90–91, 87 L.Ed. 122 (1942) (upholding legislation setting a quota for the production of wheat intended wholly for home consumption because "Congress may properly have considered that wheat consumed on the farm where grown ... would have a substantial effect in defeating and obstructing its purpose to stimulate trade," apparently on the theory that when the price rose, wheat originally intended for on-farm consumption would be released to the market, thus suppressing prices interstate).

In short, there is ample evidence that Congress reasonably could have found that a nexus exists between the class of activity regulated by § 922(q)—firearms possession—and interstate commerce.

## II. *CONCLUSION.*

█ This court clearly is not bound by the Fifth Circuit's decision in *Lopez.* It is, however, bound to follow the Tenth Circuit, which has adopted the Supreme Court's approach in *Perez.* Under *Perez,* Congress need not make new particularized findings of an interstate commerce nexus in order to legislate. Rather, Congress properly may regulate a class of activities that is within the reach of the federal power, and courts may not excise individual instances of the class.

Here, the class of firearms possession has been held to be within reach of the federal interstate commerce power, as evidenced by Congress's findings in connection with the Omnibus Crime Control and Safe Streets Act of 1968. Under established precedents there is no question but that Congress reasonably could have found a nexus between firearms possession and interstate commerce.

Indeed, very few activities exist regarding which Congress could not reasonably find an interstate commerce nexus. That is why the *Lopez* court was able to discover "no Supreme Court decision in the last half century that has set aside [congressional findings supporting a commerce nexus] as without a rational basis." *Lopez,* 2 F.3d at 1363 n. 43. Perhaps unfortunately, Congress's legislative power under the Commerce Clause has become a virtual blank check,[10] a fact that

---

**10.** Even where Congress makes particularized findings of an interstate commerce nexus regarding its Commerce Clause enactments, the regulation of commerce most often is not what has motivated Congress to act. Thus, such findings have become mere technicalities: if the Supreme

courts may well find repugnant to separation of powers doctrine, upon which the United States government is constructed. However, as stated above, the Supreme Court has declared that:

> "[t]he principal and basic limit on the federal commerce power is that inherent in all congressional action—the built-in restraints that our system provides through state participation in federal governmental action. The *political* process ensures that the laws that unduly burden the States will not be promulgated." *Garcia,* 469 U.S. at 556, 105 S.Ct. at 1020 (emphasis added).

The 1985 *Garcia* decision came down before the current rush in Congress to federalize crimes previously considered state and local offenses. Unfortunately, the *Garcia* Court's confidence in the political process to deter the zeal of Congress to centralize prosecutorial power may have been too optimistic. Indeed, apparently irresistible political pressures to be perceived as "tough on crime" are driving Congress to federalize crimes such as that here charged, in circumstances where clear-minded, objective analysis can discern no meaningful effect on interstate commerce in the sense intended by the Commerce Clause. Nevertheless, this court is bound to recognize and follow decisions of the Supreme Court and the Tenth Circuit defining the scope of Congress's commerce power.[11] Therefore, I reluctantly conclude, as I must, that § 922 is within the reach of

Court were to invalidate § 922, Congress simply would make the requisite findings, which would have to be upheld "if there is any rational basis" for them, and reenact the provision.

11. The District Court for the District of Alabama, relying on *Lopez,* held § 922(q) unconstitutional in an opinion that reflects judicial frustration with the pace at which Congress is federalizing the criminal law. *United States v. Morrow,* 834 F.Supp. 364 (N.D.Ala.1993). That frustration also is evident in *United States v. Cortner,* 834 F.Supp. 242 (M.D.Tenn.1993), which holds that the federal carjacking statute, 18 U.S.C. § 2119, exceeds Congress's commerce power. *But see United States v. Watson,* 815 F.Supp. 827, 830–31 (E.D.Pa.1993) ("[T]he power of Congress to regulate as it did in [18 U.S.C.] § 2119 cannot be seriously questioned.").

This court shares the concern expressed by the *Morrow* and *Cortner* opinions, that in its haste to define as federal crimes conduct traditionally subject only to state or local regulation and prosecution, Congress is stretching the commerce power far beyond its intended scope, and thus emasculating the Tenth Amendment's clear intent to reserve regulation of conduct that does not *affect* interstate commerce to the states and the people.

Indeed Colorado has a statute exercising that reserved power by defining as a crime the possession of a gun on school property. *See* Colo. Rev.Stat. § 18–12–105.5. Section 922, like the numerous narcotics laws making federal crimes of conduct already criminal under state statutes, grants unelected federal prosecutors vast power and discretion to pick and choose which defendants shall be prosecuted in the state courts, and which in federal courts where much greater penalties are imposed, and without the possibility of parole. While this court has no argument with substantial punishment for persons who violate the law, those who commit the same misconduct under similar circumstances should not be given disparate sentences at the whim of a prosecutor who can choose either to prosecute under a harsh federal statute or leave the matter to state prosecution under a comparatively lenient statute.

The current race to federalize state crimes epitomizes the very tendency most feared by those who wrote and ratified the Constitution: a strong central government relegating to itself all power. That concern led them to assure future generations that the central government would be restrained by a constitution giving it only powers there expressly granted and enumerated. The Tenth Amendment reserved to the states and the people all powers not so granted. Those farsighted constitutional draftsmen foresaw that locally elected prosecutors were more likely to respect the liberties of the people than officials appointed by, and answerable only to, a far off, national government. It would have seemed absurd to them for anyone to argue that the Commerce Clause—intended as it was to prevent state and local tariffs, and other trade barriers, hampering interstate and foreign commerce—authorized the federal government to criminalize carrying a gun within three blocks of a public or private school or college. While it is for Congress, not courts, to make laws, Congress may do so only subject to the Constitution. And it is for courts, not Congress, to interpret the Constitution and declare when Congress has overstepped its bounds. If the Tenth Amendment retains any vitality whatever in the area of criminal law, that remnant is fast being eroded. Under existing case law, only appellate courts can halt that erosion. Here Congress has not expressed in any way an interstate commerce nexus to support the instant statute or a rationale to suggest to a court how carrying a gun within 1,000 feet of a school "affects" interstate commerce. This court, as much as Congress, decries carrying guns to school, but that is not the issue here. Were I not bound by precedents of the Supreme Court and the Tenth Circuit, I would hold § 922(q) unconstitutional as violating the Tenth Amendment.

**1094**

that power.[12]

Accordingly IT IS ORDERED that, for the reasons set forth above, Mr. Ornelas' motion to dismiss the indictment is denied.

---

**12.** Apparently in an effort ·to mitigate any perceived constitutional problem with § 922(q), the government obtained an indictment charging, as an element of the offense, that the pistol "had been shipped and transported in interstate commerce." *See Lopez*, 2 F.3d at 1368 ("Conceivably, a conviction under section 922(q) might be *sustained if the government alleged and proved that the offense had a nexus to commerce.*"). Mr. Ornelas, however, does not argue that an otherwise constitutional statute is unconstitutional as applied to him. Instead he argues that the statute is *facially* unconstitutional because Congress lacked the authority to enact it. The language of the indictment has no bearing on Congress's authority, for neither the United States Attorney nor the grand jury can amend or rewrite the statute to cure a facial defect. It would be an odd twist on the separation of powers doctrine to allow a federal prosecutor to supplement Congress's Article I powers through artful pleading.